## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA, ROME DIVISION

| | | |
|---|---|---|
| Huibin Dai, | ) | |
| *Plaintiff,* | ) | |
| vs. | ) | Civil Action File No. |
| | ) | |
| Bella Surfaces Group, LLC, Ahmad | ) | |
| Ali Negahban, and Nicolas Negahban | ) | |
| *Defendant.* | ) | |
| | ) | |

---

## COMPLAINT FOR INJUNCTIVE RELIEF DUE TO BREACH OF FIDUCIARY DUTY, GROSS NEGLIGENCE, AND BREACH OF CONTRACT AND FOR DAMAGES AND DEMAND FOR JURY TRIAL

---

TO THE HONORABLE JUDGE OF SAID COURT:

Comes now Plaintiff, Huibin Dai (hereinafter "Dai"), and sues Defendants, Bella Surfaces Group, LLC, an Alabama Limited Liability Company, (hereinafter "BSG") and Ahmad Ali Negahban and Nicolas Negahban (hereinafter collectively "Individual Defendants") for temporary and permanent injunctive relief, and damages, and would respectfully show the court the following:

///

///

///

## A. NATURE OF THE ACTION

1. This diversity suit is an action for injunctive relief and for damages, for breaches of fiduciary duty, gross negligence, and breach of contract brought by a 40% minority shareholder of an Alabama limited liability company, as a derivative action, on behalf of the limited liability company, naming the company as a nominal defendant, and against the other remaining members of the same limited liability.  In addition, Plaintiff alleges claims as an individual, as to which the gravamen of the claims belong to him, individually, separate and apart from the whole body of the shareholders.

## B. PARTIES

2. Plaintiff Dai, is an individual residing in Hangzhou City, Zhejiang Province, China.  Dai is and has been, at all times relevant to this case, the owner of a 40% Member interest in BSG.

3. Defendant BSG is a Domestic For-Profit Limited Liability Company, and is organized and existing under the laws of the State of Alabama, whose official address, listed with the Alabama Secretary of State, is "2 NORTH JACKSON STREET, SUITE 605 MONTGOMERY, AL 36104",

WEBSITE: https://www.bellaflooringgroup.com/. Defendant, Bella Surfaces Group, LLC, also, apparently, has offices and warehouse at 3572 S Dug Gap Rd, Dalton, GA 30720. Defendant Bella Surfaces Group, LLC therefore resides in Whitfield County, Georgia, and it may be served with process via its Chief Executive Ahmad Ali Negahban at his official address of 3572 S Dug Gap Rd, Dalton, GA 30720, or wherever he may be found.

4. Defendant Ahmad Ali Negahban is a resident of Whitfield County, Georgia, and may be served with process at his official office address of 3572 S Dug Gap Rd, Dalton, GA 30720, or wherever he may be found, is over 18 years of age, and is sui juris.  Ahmad Ali Negahban holds, apparently, a 40% Member interest in BSG.

5. There was an individual named Matthew Syler who was a resident of Madison County, Alabama, who passed away in the year 2023.  Matthew Syler, during his lifetime, held a 10% Member interest in BSG.

6. Defendant Nicolas Negahban, although he is, apparently, a Canadian citizen, is a resident of Whitfield County, Georgia, in that he does business there, and may be served with process at his official office address of 3572 S Dug Gap Rd, Dalton, GA 30720, or wherever he may be found, is over 18 years of age, and is sui juris.  Nicolas Negahban holds a 10% Member interest in BSG.

7. The Individual Defendants' relationship to BSG will be explained hereinafter.

8. At all times relevant to this case, each of the Individual Defendants, and decedent Matthew Syler, was acting as an agent and/or employee of each of his other co-defendants, and in doing the things hereinafter described, acted within the course and scope of that agency and/or employment.

## C. JURISDICTION AND VENUE

9. Jurisdiction in this action is proper in this Court pursuant to 28 U.S.C. § 1332(a)(2) as this is a diversity jurisdiction action and the sole plaintiff is a citizen of a foreign state (i.e., the People's Republic of China) and the Defendants are citizens of a state (i.e., the State of Georgia), the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and no exception applies.

10. Venue in this action is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because all, or substantially all, of the acts or omissions giving rise to the claims asserted herein occurred in this District.

## D. FACTS AND COUNTS

11. This is, in part, a derivative action by a minority shareholder of an Alabama limited liability company, and an individual action by that person, brought against other officers and members of the limited liability company.

## BSG'S BUSINESS, OWNERSHIP AND MANAGEMENT AUTHORITY

12.     BSG was formed on 5/15/2018 by the filing of a Certificate of Formation that date with the Alabama Secretary of State and the purpose of forming LBNG was to operate a business to manufacture, import and sell floor and wall covering products.

13.     A true and correct copy of BSG's Operating Agreement is attached hereto as Exhibit 1 (hereinafter "the OA" or "Exhibit 1").  Under the OA, section X.F. and X.G., Alabama law is the "controlling law" with regard to the OA.

14.     The OA was and is an enforceable contract and Plaintiff has performed all obligations that it was his duty to perform in relation to the OA.

15.     At the time of formation, BSG had 4 identified Members, Dai, Ahmad Ali Negahban, Matthew Syler, and Nicolas Negahban.

16.     Dai's initial capital contribution, as set forth in the OA, to BSG was supposed to be $1,600,000.00, in exchange for which he was to receive a 40% Membership Interest in BSG.   (See Exhibit 1, section III.A., at 2nd page, and "Attachment A" at page 11.)  In actuality, Dai contributed $2,000,000 in capital towards the formation of BSG.  The reason for that will be explained hereinafter.

17.     Ahmad Ali Negahban held a 40% Membership Interest in BSG at the time of formation in exchange for which he was obligated to contribute $1,600,000 in capital towards the formation of BSG.  (See Exhibit 1, section III.A., at 2nd page, and "Attachment A" at page 11.)

18.     Matthew Syler and Nicolas Negahban each held a 10% Membership Interest in BSG at the time of formation, as to which they were obligated to contribute $400,000 each in capital towards the formation of BSG.   (See Exhibit 1, section III.A., at 2nd page, and "Attachment A" at page 11.)

19.     Each of the Members signed the OA on the last page of the OA.   (See Exhibit 1, 10th page).

20.     Plaintiff is informed and believes that Ahmad Ali Negahban failed to contribute $450,000 out of the $1,600,000 he was contractually obligated to contribute, and Matthew Syler and Nicolas Negahban each failed to contribute their required $400,000 as specified in the OA.   (See Exhibit 1, section III.A., at 2nd page, and "Attachment A" at page 11.)

21.     The OA of BSG specifically defined what the fiduciary duties of the Members were with respect to BSG on the 5th page of the OA at section III.H.   (See Exhibit 1, Section III.H., at the 5th page.)   Among the listed and defined "Fiduciary Duties" of the Members specified in that section of the OA were the following:

 "     1. Loyalty and Care. Except to the extent otherwise provided herein, each Member shall have a fiduciary duty of loyalty and care similar to that of members of limited liability companies organized under the laws of Alabama.
        2. Competition with the Company. The Members shall refrain from dealing with the Company in the conduct of the Company's business as or on behalf of a party having an interest adverse to the Company unless a majority, by individual vote, of the Members excluding the interested Member, consents thereto. The Members shall refrain from competing with the Company in the conduct of the Company's business unless a majority, by individual vote, of the Members excluding the interested Member, consents thereto. In the event that a

Member is the sole Member of the Company, no vote shall be required."

22.    At no time did Plaintiff consent to relieve any of the defendants of any of their fiduciary duties specified above.

23.    At no time was there a valid vote or consent of the Members of BSG which would have authorized any of the Members to form or operate a business in competition with the business of BSG, i.e. manufacturing, importing, and selling floor and wall coverings.

24.    The OA and Alabama Law require Limited Liability Companies to permit their Members to access and examine their business accounts, books and records.

25.    After it was formed, Individual Defendants, and each of them, undertook the sole responsibility of managing and operating BSG, and Plaintiff was excluded from the management, control and operation of BSG.

26.    At all times relevant to this case, Individual Defendants collectively controlled the majority of the ownership interest in BSG.

27.    Matthew Syler's Position and Settlement:  Individual Defendants appointed the decedent Matthew Syler as CEO of BSG and determined his compensation, salary, bonuses and commissions without Plaintiff's consent or involvement on or about June 1, 2018.  Subsequently, Individual Defendants caused BSG to enter into an ostensible "SETTLEMENT AGREEMENT AND

GENERAL RELEASE" (hereinafter referred to as the "Syler Settlement") with decedent Matthew Syler on or about November 22, 2021, again, without Plaintiff's consent or involvement. A true and correct copy of said Syler Settlement is attached hereto as Exhibit 2.  Under the terms of the Syler Settlement, BSG agreed to pay and, apparently, paid decedent Matthew Syler $103,000 in "Separation Pay".  Also, under the terms of the Syler Settlement, *inter alia*, decedent Matthew Syler was to and did, apparently, "quitclaim" his 10% shares (or whatever interest he had) in BSG to BSG. See Exhibit 3, attached hereto.  In addition, decedent Syler and BSG each received a purported release of one another arising from the  Syler Settlement.  Plaintiff contends that entering into these transactions with decedent Matthew Syler without Plaintif's consent was a breach of fiduciary duty on the part of Individual Defendants.

28.    Individual Defendants lured Plaintiff into contributing more capital towards the formation and operation of BSG than was agreed in the OA, and then operated BSG as if Plaintiff had no rights and/or routinely disregarded Plaintiff's rights to be involved in the decision making process with regard to BSG.

29.    Attempts to Mediate and Prior Action in Alabama:  Prior to initiating this lawsuit, Plaintiff sought to mediate his dispute with Defendants pursuant to Section IX of the OA by sending an email to Defendants requesting mediation on January 19, 2023.  Thereafter, the parties had informal settlement discussions.

Although the parties discussed mediation, they were unable to reach an agreement to formally mediate.  After the aforesaid attempts to mediate and prior to negotiations commencing, Plaintiff filed a lawsuit in the State of Alabama, in the Circuit Court of Madison County, Alabama, <u>Huibin Dai V. Bella Surfaces Groups, LLC et al</u>., on April 3, 2023, which was assigned case number 47-CV-2023-900337.00.  Many of the allegations made in this action were made in that prior action.  After several months of settlement negotiations in that earlier case, the parties were unable to reach a settlement and, thereafter, Defendants, including BSG, Ahmad Ali Negahban and Nicolas Negahban, filed a motion to dismiss said action purely on grounds of lack of personal jurisdiction pursuant to Rules 4.2 and 12(b)(2) of the Alabama Rules of Civil Procedure, alleging that Ahmad Ali Negahban and Nicolas Negahban were and are Canadian citizens, and that the principal place of business of BSG is in the State of Georgia.  The Trial Court in case number 47-CV-2023-900337.00 granted said motion to dismiss that case on those jurisdictional grounds on November 27, 2023.  Under Alabama Rules of Civil Procedure, Rule 41(b), such a dismissal, for "lack of jurisdiction", does not operate as an "adjudication on the merits."  Subsequently, Ahmad Ali Negahban declared himself "CEO" of BSG, which continues to do business exclusively in the State of Georgia, thereby admitting that he does business in the State of Georgia.

<u>A SET OF DISPUTES AROSE BETWEEN BSG'S MEMBERS</u>

30.     Within the time for bringing an action on that basis, Plaintiff Dai has learned that the Individual Defendants and each of them, including, without limitation, Ahmad Ali Negahban and Nicolas Negahban, formed a competing company in Calgary, Alberta, Canada, on or about October 9, 2019, by the name of "Bella Surfaces Group Canada, Inc.," in which Plaintiff  and BSG were neither offered nor have any ownership interest (hereinafter referred to as the "Canadian entity").  This Canadian entity was created by Defendants without Plaintiff Dai's consent, and they attempted to keep it secret from him.  Plaintiff Dai is, therefore, informed and believes that the creation and operation of Canadian entity was an act of disloyalty and competition with BSG in violation of the OA and in breach of Defendants', including , without limitation, Ahmad Ali Negahban's, and Nicolas Negahban's fiduciary duties to BSG.

31.     In May of 2022, when Plaintiff confronted Ahmad Ali Negahban about the impropriety of the creation, ownership and operation of the Canadian entity, Ahmad Ali Negahban informed Plaintiff that the Canadian entity was owned entirely by Nicolas Negahban.

32.     Ahmad Ali Negahban is Nicolas Negahban's father.  The close relationship between father and son strongly suggests that Ahmad Ali Negahban also has a beneficial interest in the Canadian entity.

33.     Plaintiff is informed and believes that Ahmad Ali Negahban does, in

fact, have a beneficial interest in the Canadian entity.

34.    The act of creating and operating the Canadian entity, a competing business in Canada, violated the specific fiduciary duties of Defendants, and each of them, as spelled out in the OA.  It was, therefore, a breach of fiduciary duty by Defendants.

35.    Aside from the specific fiduciary duties spelled out in the OA, the act of creating and operating the Canadian entity, a competing business in Canada, violated general fiduciary duties that controlling shareholders of an LLC owe to minority and non-controlling shareholders of the OA.  It was, therefore, a breach of fiduciary duty by Defendants.

36.    Plaintiff has insufficient information about the damages caused to BSG or to Plaintiff, separate and apart from BSG, from the secret creation and operation of the above-described Canadian corporation, and will seek leave to amend this complaint when the information is discovered.

37.    After the formation of BSG, Plaintiff Dai repeatedly requested access to the business accounts, books and records of BSG in order to examine its business operations.  Beginning in 2022, Defendants and each of them refused to allow Plaintiff access to the business accounts, books and records of BSG, despite Plaintiff's repeated requests.

38.    Due to the aforementioned acts, there has been a breakdown in the

relationship between Plaintiff and Defendants, such that it would be appropriate to dissolve BSG.

## FIRST COUNT

## BREACH OF FIDUCIARY DUTIES

(Direct action against Individual Defendants)

39.     The allegations of paragraphs 1 through 38, above, are incorporated with the same force and effect as if fully set forth below.

40.     This action is brought by Plaintiff directly under AL Code § 10A-5A-9.01. to the extent the gravamen of the harms alleged are harms to Plaintiff directly, as opposed to harms done to BSG, itself, and to the whole of its membership interest.

41.     By virtue of their relationship with BSG, the Individual Defendants were in positions of trust and special confidence and, as such, owed fiduciary duties of loyalty, confidence, and good faith and fair dealing to Plaintiff as well as to BSG.

42.     The aforementioned acts of the Individual Defendants, including but not limited to creating and operating the Canadian entity, shutting Plaintiff out from management decisions of BSG, hiring decedent Matthew Syler without

Plaintiff's consent, entering into the Syler Settlement without Plaintiff's consent, and not allowing Plaintiff to inspect the business accounts, books and records of BSG constituted a breach of the fiduciary duties that Defendants owed to Plaintiff, individually.

43.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered damages in an amount that is not presently ascertainable, but which shall be proved at the time of trial.

**SECOND COUNT**

**BREACH OF FIDUCIARY DUTIES**

(Derivative action against all Defendants)

44.    The allegations of paragraphs 1 through 38, above, are incorporated with the same force and effect as if fully set forth below.

45.    This action is brought by Plaintiff as a derivative action on behalf of BSG pursuant to AL Code § 10A-5A-9.02, based on the OA's commitment to use Alabama law throughout and at paragraph X.G., "Any matter not specifically covered by a provision of this Agreement shall be governed by the applicable provisions of Alabama law."

46.    Pursuant to AL Code § 10A-5A-9.04(b), it would be futile to first make a demand, prior to commencing this action, under AL Code § 10A-5A-9.04(a) for the limited liability company to bring an action to enforce the rights that

are sought to be enforced by this Complaint because each of the Individual Defendants, acting as agents for one another, are the persons who have violated the rights of the limited liability company sought to be enforced and a person could not be expected to initiate litigation against themselves.

47.     Plaintiff will fairly and adequately represent the interests of the whole body of the Members of BSG similarly situated in enforcing the rights BSG.

48.     The business and reputation of BSG have been damaged by reason of the transactions described hereinabove.

49.     By virtue of their relationship with BSG, the Individual Defendants were in positions of trust and special confidence and, as such, owed fiduciary duties of loyalty, confidence, and good faith and fair dealing to Plaintiff as well as to BSG.

50.     BSG is named as a nominal defendant in this derivative claim.

51.     The aforementioned acts of the Individual Defendants, including but not limited to creating and operating the Canadian entity, shutting Plaintiff out from management decisions of BSG, hiring decedent Matthew Syler without Plaintiff's consent, entering into the Syler Settlement without Plaintiff's consent, and not allowing Plaintiff to inspect the business accounts, books and records of BSG constituted a breach of the fiduciary duties that Defendants owed to BSG.

52.     As a direct and proximate result of Defendants' wrongful conduct,

Plaintiffs have suffered damages in an amount that is not presently ascertainable, but which shall be proved at the time of trial.

### THIRD COUNT

### Gross Negligence

(Derivative action against all Defendants)

53.     The allegations of paragraphs 1 through 38, above, are incorporated with the same force and effect as if fully set forth below.

54.     This action is brought by Plaintiff as a derivative action on behalf of BSG pursuant to AL Code § 10A-5A-9.02.

55.     Pursuant to AL Code § 10A-5A-9.04(b), it would be futile to first make a demand, prior to commencing this action, under AL Code § 10A-5A-9.04(a) for the limited liability company to bring an action to enforce the rights that are sought to be enforced by this Complaint because each of the Individual Defendants, acting as agents for one another, are the persons who have violated the rights of the limited liability company sought to be enforced and a person could not be expected to initiate litigation against themselves.

56.     Plaintiff will fairly and adequately represent the interests of the whole body of the Members of BSG similarly situated in enforcing the rights BSG.

57.     The business and reputation of BSG have been damaged by reason of

the transactions described hereinabove.

58.   By virtue of their relationship with BSG, the Individual Defendants owed a duty of reasonable care to BSG in their management and operation of the business.

59.   BSG is named as a nominal defendant in this derivative claim.

60.   The aforementioned acts of the Individual Defendants, including but not limited to creating and operating the Canadian entity, shutting Plaintiff out from management decisions of BSG, hiring decedent Matthew Syler without Plaintiff's consent, entering into the Syler Settlement without Plaintiff's consent, and not allowing Plaintiff to inspect the business accounts, books and records of BSG constituted a breach of their duty of reasonable care and gross negligence.

61.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and BSG have suffered damages in an amount that is not presently ascertainable, but which shall be proved at the time of trial.

62.   The gross negligence in the management and operation of BSG by Individual Defendants harmed the business and reputation of BSG.

63.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has suffered damages in an amount that is not presently ascertainable, but which shall be proved at the time of trial.

## FOURTH COUNT

## Breach of Contract

### (Direct action against Individual Defendants)

64.     The allegations of paragraphs 1 through 38, above, are incorporated with the same force and effect as if fully set forth below.

65.     This action is brought by Plaintiff directly under AL Code § 10A-5A-9.01., or, if Georgia law is deemed to apply, under corresponding provisions thereof, to the extent the gravamen of the breach of contract alleged constituted the breach of a duty owed to Plaintiff directly, as opposed to obligations owed to BSG, itself, and to the whole of its membership interest.

66.     By virtue of their relationship with BSG, the Individual Defendants were in positions of trust and special confidence and, as such, owed fiduciary duties of loyalty, confidence, and good faith and fair dealing to Plaintiff as well as to BSG.

67.     The aforementioned acts of the Individual Defendants, including but not limited to creating the Canadian entity and not allowing Plaintiff to inspect the business accounts, books and records of BSG constituted a breach of the contractual duties that Individual Defendants owed to Plaintiff, individually.

68.     The failure of decedent Matthew Syler and defendant Nicolas Negabahn to each pay their $400,000 due under the OA towards their capital contribution to BSG was a breach of contract.

69.     The failure of Ahmad Ali Negahban to contribute $450,000 out of the $1,600,000 he was contractually obligated to contribute towards his capital contribution to BSG was a breach of contract.

70.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered damages in an amount that is not presently ascertainable, but which shall be proved at the time of trial.  At a minimum, Ahmad Ali Negahban caused damages of $450,000 and decedent Matthew Syler caused damages of $400,000 and Nicolas Negabahn caused damages of $400,000 for the reasons set forth above.

71.     Causing BSG to enter into the Syler Settlement without Plaintiff's consent also constituted a breach of contract, causing the loss of Plaintiff's claim against decedent Matthew Syler, by way of the release granted to him, causing damages of $400,000.

72.     At all times relevant, Plaintiff has done everything he was obligated to do under the terms of the contract.

## FIFTH COUNT

## Breach of Contract

(Derivative action against all Defendants)

73.     The allegations of paragraphs 1 through 38, above, are incorporated with the same force and effect as if fully set forth below.

74.    This action is brought by Plaintiff as a derivative action on behalf of BSG pursuant to AL Code § 10A-5A-9.02.

75.    Pursuant to AL Code § 10A-5A-9.04(b), it would be futile to first make a demand, prior to commencing this action, under AL Code § 10A-5A-9.04(a) for the limited liability company to bring an action to enforce the rights that are sought to be enforced by this Complaint because each of the Individual Defendants, acting as agents for one another, are the persons who have violated the rights of the limited liability company sought to be enforced and a person could not be expected to initiate litigation against themselves.

76.    Plaintiff will fairly and adequately represent the interests of the whole body of the Members of BSG similarly situated in enforcing the rights BSG.

77.    The business and reputation of BSG have been damaged by reason of the transactions described hereinabove.

78.    By virtue of their relationship with BSG, the Individual Defendants were in positions of trust and special confidence and, as such, owed fiduciary duties of loyalty, confidence, and good faith and fair dealing to Plaintiff as well as to BSG.

79.    The aforementioned acts of the Individual Defendants, including but not limited to creating the Canadian entity and not allowing Plaintiff to inspect the business accounts, books and records of BSG constituted a breach of the

contractual duties that Individual Defendants owed to BSG.

80.    The failure of Defendants Matthew Syler and Nicolas Negabahn to each pay their $400,000 due under the OA towards their capital contribution to BSG was a breach of contract.

81.    The failure of Ahmad Ali Negahban to contribute $450,000 out of the $1,600,000 he was contractually obligated to contribute towards his capital contribution to BSG was a breach of contract.

82.    As a direct and proximate result of Defendants' wrongful conduct, BSG has suffered damages in an amount that is not presently ascertainable, but which shall be proved at the time of trial.  At a minimum, Ahmad Ali Negahban caused damages of $450,000 and Matthew Syler caused damages of $400,000 and Nicolas Negabahn caused damages of $400,000 for the reasons set forth above.

85.    Causing BSG to enter into the Syler Settlement without Plaintiff's consent also constituted a breach of contract, causing the loss of BSG's claim against decedent Matthew Syler, by way of the release granted to him, causing damages of $400,000.

84.    At all times relevant, BSG has done everything it was obligated to do under the terms of the contract.

85.    BSG is named as a nominal defendant in this derivative claim.

## SIXTH COUNT

## DISSOLUTION OF BSG

(Direct action against all Defendants)

86.     The allegations of paragraphs 1 through 38, above, are incorporated with the same force and effect as if fully set forth below.

87.     AL Code § 10A-5A-7.01 allows a member of a limited liability company to apply to a circuit court for an order dissolving the limited liability company on the grounds that it is not reasonably practicable to carry on the limited liability company's activities and affairs in conformity with the limited liability company agreement.

88.     In the present case, based upon the facts and circumstances set forth above, it is not reasonably practicable to carry on BSG's activities and affairs in conformity with the OA.

89.     Therefore, Plaintiff Dai seeks an order of dissolution of BSG in accordance with AL Code § 10A-5A-7.01 and for BSG's affairs to be wound up.

### E.  RECOVERY OF ATTORNEYS' FEES WARRANTED

90.     Defendants have acted in bad faith, have been stubbornly litigious, and/or have caused Plaintiff unnecessary trouble and expense. Thus, Plaintiff is entitled to and specially pleads recovery of attorney fees and other litigation expenses pursuant to

Georgia Code Section 13-6-11, as determined by the jury.

## F. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully request an award in this favor and against Defendants as follows:

(1) Awarding Plaintiff damages on his direct claims in an amount to be determined at trial;

(2) Awarding Plaintiff punitive damages on his direct claim for Breach of Fiduciary Duties in an amount to be determined at trial;

(3) Awarding Plaintiff costs and expenses associated with his direct claims, including, but not limited to attorneys' fees;

(4) For an injunction compelling Defendants to turn over the records of the bank accounts, books and other records of BSG to Plaintiff for inspection;

(5) On Plaintiff's derivative claims on behalf of BSG:

(a) that Individual Defendants be required to account to BSG for all profits made by them in connection with the transactions herein described between them and BSG;

(b) that a judgment be entered for BSG against Individual Defendants, separately, severally and jointly, for all profits made by said Individual Defendants;

(c) that a judgment be entered for BSG and against the Individual

Defendants, separately, severally and jointly, for all damage sustained by BSG as a result of the transactions herein set forth;

(d) awarding BSG punitive damages on Plaintiff's derivative claim for Breach of Fiduciary Duties in an amount to be determined at trial;

(e) an allowance of reasonable attorney's fee and expenses for Plaintiff's lawyer; and

(f) such other relief to which BSG, the Plaintiff and other Members similarly situated may be entitled.

(6) For an order for BSG to be dissolved and for its affairs to be wound up pursuant to AL Code § 10A-5A-7.01;

(7) Trial by jury; and

(8) Awarding Plaintiff such other and further relief as the Court deems just and proper.

DEMAND FOR JURY TRIAL

Plaintiff requests a trial by jury on all issues so triable.


Respectfully submitted, this 4th of

December, 2023.



LAW OFFICES OF STEVEN L. SUGARS


/s/ Steven L. Sugars

_____

Steven L. Sugars
Requesting Admission Pro Hac Vice
440 E. Huntington Drive, Suite #347
Arcadia, CA 91006
Phone: (626) 243-3343
Fax: (626) 609-0439
Email:sugarslaw@gmail.com


 /s/ Jeff Zhengquan Xie

_____

Jeff Zhengquan Xie
(Georgia Bar No. 779614)
1770 Indian Trail Lilburn Rd,Suite 450
Norcross, GA 30093
Phone: (678) 380-0698
Fax: (678)380-0668
Email: jeff@xielaw.com

EXHIBIT 1

# Limited Liability Company Agreement of
## Bella Surfaces Group,
### a Limited Liability Company

**I.    Formation.**

A.    <u>State of Formation</u>. This is a Limited Liability Company Operating Agreement (the "Agreement") for Bella Surfaces Group, a Member-managed Alabama limited liability company (the "Company") formed under and pursuant to Alabama law.

B.    <u>Operating Agreement Controls</u>. To the extent that the rights or obligations of the Members or the Company under provisions of this Operating Agreement differ from what they would be under Alabama law absent such a provision, this Agreement, to the extent permitted under Alabama law, shall control.

C.    <u>Primary Business Address</u>. The location of the primary place of business of the Company is:

PO Box 740, Madison, Alabama 35758, or such other location as shall be selected from time to time by the Members.

D.    <u>Registered Agent and Office</u>. The Company's initial agent (the "Agent") for service of process is Matthew Syler. The Agent's registered office is 115 Wolf Creek Trail SW, Huntsville, Alabama 35758. The Company may change its registered office, its registered agent, or both, upon filing a statement with the Alabama Secretary of State.

E.    <u>No State Law Partnership</u>. No provisions of this Agreement shall be deemed or construed to constitute a partnership (including, without limitation, a limited partnership) or joint venture, or any Member a partner or joint venturer of or with any other Member, for any purposes other than federal and state tax purposes.

**II.    Purposes and Powers.**

A.    <u>Purpose</u>. The Company is created for the following business purpose:

Bella Surfaces Group will Manufacturer, Import and Sell Floor and Wall covering products

B.    <u>Powers</u>. The Company shall have all of the powers of a limited liability company set forth under Alabama law.

C.    <u>Duration</u>. The Company's term shall commence upon the filing of an Articles of Organization and all other such necessary materials with the state of Alabama. The Company will operate until terminated as outlined in this Agreement unless:

1.    The Members vote unanimously to dissolve the Company;

2.      No Member of the Company exists, unless the business of the Company is continued in a manner permitted by Alabama law;

3.      It becomes unlawful for either the Members or the Company to continue in business;

4.      A judicial decree is entered that dissolves the Company; or

5.      Any other event results in the dissolution of the Company under federal or Alabama law.

**III.    Members.**

A.      <u>Members</u>. The Members of the Company (jointly the "Members") and their Membership Interest in the same at the time of adoption of this Agreement are as follows:

Huibin Dai, 40%

Ahmad Ali Negahban, 40%

Matthew Syler, 10%

Nicolas Negahban, 10%

B.      <u>Initial Contribution</u>. Each Member shall make an Initial Contribution to the Company. The Initial Contributions of each shall be as described in Attachment A, <u>Initial Contributions of the Members</u>.

No Member shall be entitled to interest on their Initial Contribution. Except as expressly provided by this Agreement, or as required by law, no Member shall have any right to demand or receive the return of their Initial Contribution.

C.      <u>Limited Liability of the Members</u>. Except as otherwise provided for in this Agreement or otherwise required by Alabama law, no Member shall be personally liable for any acts, debts, liabilities or obligations of the Company beyond their respective Initial Contribution. The Members shall look solely to the Company property for the return of their Initial Contribution, or value thereof, and if the Company property remaining after payment or discharge of the debts, liabilities or obligations of the Company is insufficient to return such Initial Contributions, or value thereof, no Member shall have any recourse against any other Member except as is expressly provided for by this Agreement.

D.      <u>Withdrawal or Death of a Member</u>. Should a Member die or withdraw from the Company by choice, the remaining Members will have the option to buy out that Member's Membership Interest in the Company. Should the Members agree to buy out the Membership Interest of the withdrawing Member, that Interest shall be paid for equally by the remaining Members and distributed in equal amounts to the remaining Members. The Members agree to hire an outside firm to assess the value of the Membership Interest.

The Members will have 90 days to decide if they want to buy the Membership Interest together and disperse it equally. If all Members do not agree to buy the Membership Interest, individual Members will then have the right to buy the Membership Interest individually. If more than one Member requests to buy the remaining Membership Interest, the Membership Interest will be paid for and split equally among those Members wishing to purchase the Membership Interest. If all Members agree by unanimous vote, the Company may choose to allow a non-Member to buy the Membership Interest thereby replacing the previous Member.

If no individual Member(s) finalize a purchase agreement by 180 days, the withdrawing Member, or their estate, may dispose of their Membership Interest however they see fit, subject to the limitations in Section III (E) below. If a Member is a corporation, trust, partnership, limited liability company or other entity and is dissolved or terminated, the powers of that Member may be exercised by its legal representative or successor.

The name of the Company may be amended upon the written and unanimous vote of all Members if a Member withdraws, dies, is dissolved or terminated.

E.    Creation or Substitution of New Members. Any Member may assign in whole or in part its Membership Interest only after granting their fellow Members the right of first refusal, as established in Section III (D) above.

1.    *Entire transfer*. If a Member transfers all of its Membership Interest, the transferee shall be admitted to the Company as a substitute Member upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement. Such admission shall be deemed effective immediately upon the transfer, and, simultaneously, the transferor Member shall cease to be a Member of the Company (a "dissociated member") and shall have no further rights or obligations under this Agreement.

2.    *Partial transfer*. If a Member transfers only a portion of its Membership Interest, the transferee shall be admitted to the Company as an additional Member upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement.

3.    Whether a substitute Member or an additional Member, absent the written consent of all existing Members of the Company, the transferee shall be a limited Member and possess only the percentage of the monetary rights of the transferor Member that was transferred without any voting power as a Member in the Company.

F.    Member Voting.
1.    *Voting power*. The Company's Members shall each have one Vote equal to the their shares. (Huibin Dai 4, Ahmad Ali Negahban 4, Matthew Syler 1, Nicolas Negahban 1)

2.    *Proxies*. At all meetings of Members, a Member may vote in person or by proxy executed in writing by the Member or by his duly authorized attorney-in-fact. Such proxy shall be delivered to the other Members of the Company before or at the time of the meeting. No proxy shall be valid after eleven months from the date of its execution, unless otherwise provided in the proxy.

G.   Duties of the Members. The Members shall cause the Company to do or cause to be done all things necessary to preserve and keep in full force and effect its existence, rights (charter and statutory) and franchises. The Members also shall cause the Company to:

1.   Maintain its own books, records, accounts, financial statements, stationery, invoices, checks and other limited liability company documents and bank accounts separate from any other person;

2.   At all times hold itself out as being a legal entity separate from the Members and any other person and conduct its business in its own name;

3.   File its own tax returns, if any, as may be required under applicable law, and pay any taxes required to be paid under applicable law;

4.   Not commingle its assets with assets of the Members or any other person, and separately identify, maintain and segregate all Company assets;

5.   Pay its own liabilities only out of its own funds, except with respect to organizational expenses;

6.   Maintain an arm's length relationship with the Members, and, with respect to all business transactions entered into by the Company with the Members, require that the terms and conditions of such transactions (including the terms relating to the amounts paid thereunder) are the same as would be generally available in comparable business transactions if such transactions were with a person that was not a Member;

7.   Pay the salaries of its own employees, if any, out of its own funds and maintain a sufficient number of employees in light of its contemplated business operations;

8.   Not guarantee or become obligated for the debts of any other person or hold out its credit as being available to satisfy the obligations of others;

9.   Allocate fairly and reasonably any overhead for shared office space;

10.   Not pledge its assets for the benefit of any other person or make any loans or advances to any person;

11.   Correct any known misunderstanding regarding its separate identity;

12.   Maintain adequate capital in light of its contemplated business purposes;

13.   Cause its Members to meet or act pursuant to written consent and keep minutes of such meetings and actions and observe all other Alabama limited liability company formalities;

14.    Make any permitted investments directly or through brokers engaged and paid by the Company or its agents;

15.    Not require any obligations or securities of the Members; and

16.    Observe all other limited liability formalities.

Failure of the Members to comply with any of the foregoing covenants shall not affect the status of the Company as a separate legal entity or the limited liability of the Members.

H.    Fiduciary Duties of the Members.
1.    *Loyalty and Care.* Except to the extent otherwise provided herein, each Member shall have a fiduciary duty of loyalty and care similar to that of members of limited liability companies organized under the laws of Alabama.

2.    *Competition with the Company.* The Members shall refrain from dealing with the Company in the conduct of the Company's business as or on behalf of a party having an interest adverse to the Company unless a majority, by individual vote, of the Members excluding the interested Member, consents thereto. The Members shall refrain from competing with the Company in the conduct of the Company's business unless a majority, by individual vote, of the Members excluding the interested Member, consents thereto. In the event that a Member is the sole Member of the Company, no vote shall be required.

3.    *Duties Only to the Company.* The Member's fiduciary duties of loyalty and care are to the Company and not to the other Members. The Members shall owe fiduciary duties of disclosure, good faith and fair dealing to the Company and to the other Members. A Member who so performs their duties shall not have any liability by reason of being or having been a Member.

4.    *Reliance on Reports.* In discharging the Member's duties, a Member is entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, if prepared or presented by any of the following:

i.    One or more Members or employees of the Company whom the Member reasonably believes to be reliable and competent in the matters presented.

ii.    Legal counsel, public accountants, or other persons as to matters the Member reasonably believes are within the persons' professional or expert competence.

iii.    A committee of Members of which the affected Member is not a participant, if the Member reasonably believes the committee merits confidence.

I.    Waiver of Partition: Nature of Interest. Except as otherwise expressly provided in this Agreement, to the fullest extent permitted by law, each Member hereby irrevocably waives any right or power that such Member might have to cause the Company or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of the

Company, to compel any sale of all or any portion of the assets of the Company pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of the Company. No Member shall have any interest in any specific assets of the Company.

J.      Compensation of Members. The Members shall have the authority to fix the compensation of individual Members. All Members may be paid their expenses, if any, of attendance at meetings of the Members, which may be a fixed sum for attendance at each meeting of the Members or a stated salary as a Member. No such payment shall preclude any Member from serving the Company in any other capacity and receiving compensation therefor.

K.      Members as Agents. All Members are agents of the Company for the purpose of its business. An act of any Member, including the signing of an instrument in the Company's name, binds the Company where the Member executed the act for apparently carrying on the Company's business or business of the kind carried on by the Company in the ordinary course, unless the Member had no authority to act for the Company in the particular matter and the person with whom the Member was dealing knew or had notice that the Member lacked authority. An act of a Member binds the Company, however, even where the Member executed the act not apparently for carrying on the Company's business or business of the kind carried on by the Company in the ordinary course only if the act was authorized by the other Members.

## IV.     Accounting and Distributions.
A.      Fiscal Year. The Company's fiscal year shall end on the last day of January.

B.      Records. All financial records including tax returns and financial statements will be held at the Company's primary business address and will be accessible to all Members.

C.      Distributions. Distributions shall be issued on a quarterly basis, based upon the Company's fiscal year. The distribution shall not exceed the remaining net cash of the Company after making appropriate provisions for the Company's ongoing and anticipatable liabilities and expenses. Each Member shall receive a percentage of the overall distribution that matches that Member's percentage of Membership Interest in the Company.

D.      Limitations on Distribution. The Company shall not make a distribution to any Member contrary to Alabama Code § 10A-5A-4.06.

## V.      Tax Treatment Election.
The Company has not filed with the Internal Revenue Service for treatment as a corporation. Instead, the Company will be taxed as a pass-through organization. The Members may elect for the Company to be treated as a C-Corporation or an S-corporation at any time.

## VI.     Dissolution.
A.      Limits on Dissolution. The Company shall have a perpetual existence, and shall be dissolved, and its affairs shall be wound up only upon the provisions established in Section II (C) above.

equally high percentages of Membership Interest in the Company, the Member with the longest continuous tenure as a Member of the Company shall be responsible for the filing of such notices.

## VII.    Exculpation and Indemnification.

A.       No Member, employee or agent of the Company and no employee, agent or affiliate of a Member (collectively, the "Covered Persons") shall be liable to the Company or any other person who has an interest in or claim against the Company for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's gross negligence or willful misconduct.

B.       To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement. Expenses, including legal fees, incurred by a Covered Person defending any claim, demand, action, suit or proceeding shall be paid by the Company. The Covered Person shall be liable to repay such amount if it is determined that the Covered Person is not entitled to be indemnified as authorized in this Agreement. No Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of such Covered Person's gross negligence or willful misconduct with respect to such acts or omissions. Any indemnity under this Agreement shall be provided out of and to the extent of Company assets only.

C.       A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any person as to matters the Covered Person reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, or any other facts pertinent to the existence and amount of assets from which distributions to the Members might properly be paid.

D.       To the extent that, at law or in equity, a Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any other Covered Person, a Covered Person acting under this Agreement shall not be liable to the Company or to any other Covered Person for its good faith reliance on the provisions of this Agreement. The provisions of the Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

E.       The foregoing provisions of this Article VII shall survive any termination of this Agreement.

## VIII.   Insurance.

The Company shall have the power to purchase and maintain insurance, including insurance on behalf of any Covered Person against any liability asserted against such person and incurred by such Covered Person in any such capacity, or arising out of such Covered Person's status as an agent of the Company, whether or not the Company would have the power to indemnify such person against such liability under the provisions of Article VII or under applicable law.

## IX.   Settling Disputes.

All Members agree to enter into mediation before filing suit against any other Member or the Company for any dispute arising from this Agreement or Company. Members agree to attend one session of mediation before filing suit. If any Member does not attend mediation, or the dispute is not settled after one session of mediation, the Members are free to file suit. Any law suits will be under the jurisdiction of the state of Alabama.

## X.   General Provisions.

A.     Notices. All notices, offers or other communications required or permitted to be given pursuant to this Agreement shall be in writing and may be personally served or sent by United States mail and shall be deemed to have been given when delivered in person or three (3) business days after deposit in United States mail, registered or certified, postage prepaid, and properly addressed, by or to the appropriate party.

B.     Number of Days. In computing the number of days (other than business days) for purposes of this Agreement, all days shall be counted, including Saturdays, Sundays and holidays; provided, however, that if the final day of any time period falls on a Saturday, Sunday or holiday on which national banks are or may elect to be closed, then the final day shall be deemed to be the next day which is not a Saturday, Sunday or such holiday.

C.     Execution of Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be an original, and all of which shall together constitute one and the same instrument.

D.     Severability. The provisions of this Agreement are independent of and separable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.

E.     Headings. The Article and Section headings in this Agreement are for convenience and they form no part of this Agreement and shall not affect its interpretation.

F.     Controlling Law. This Agreement shall be governed by and construed in all respects in accordance with the laws of the state of Alabama (without regard to conflicts of law principles thereof).

G.     Application of Alabama Law. Any matter not specifically covered by a provision of this Agreement shall be governed by the applicable provisions of Alabama law.

Notwithstanding any other provision of this Agreement, the Bankruptcy of any Member shall not cause such Member to cease to be a Member of the Company and upon the occurrence of such an event, the business of the Company shall continue without dissolution.

Each Member waives any right that it may have to agree in writing to dissolve the Company upon the Bankruptcy of any Member or the occurrence of any event that causes any Member to cease to be a Member of the Company.

B.    Winding Up. Upon the occurrence of any event specified in Section II(C), the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors. One or more Members, selected by the remaining Members, shall be responsible for overseeing the winding up and liquidation of the Company, shall take full account of the liabilities of the Company and its assets, shall either cause its assets to be distributed as provided under this Agreement or sold, and if sold as promptly as is consistent with obtaining the fair market value thereof, shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed as provided under this Agreement.

C.    Distributions in Kind. Any non-cash asset distributed to one or more Members in liquidation of the Company shall first be valued at its fair market value (net of any liability secured by such asset that such Member assumes or takes subject to) to determine the profits or losses that would have resulted if such asset were sold for such value, such profit or loss shall then be allocated as provided under this Agreement. The fair market value of such asset shall be determined by the Members or, if any Member objects, by an independent appraiser (any such appraiser must be recognized as an expert in valuing the type of asset involved) approved by the Members.

D.    Termination. The Company shall terminate when (i) all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company, shall have been distributed to the Members in the manner provided for under this Agreement and (ii) the Company's registration with the state of Alabama shall have been canceled in the manner required by Alabama law.

E.    Accounting. Within a reasonable time after complete liquidation, the Company shall furnish the Members with a statement which shall set forth the assets and liabilities of the Company as at the date of dissolution and the proceeds and expenses of the disposition thereof.

F.    Limitations on Payments Made in Dissolution. Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely to the assets of the Company for the return of its Initial Contribution and shall have no recourse for its Initial Contribution and/or share of profits (upon dissolution or otherwise) against any other Member.

G.    Notice to Alabama Authorities. Upon the winding up of the Company, the Member with the highest percentage of Membership Interest in the Company shall be responsible for the filing of all appropriate notices of dissolution with Alabama and any other appropriate state or federal authorities or agencies as may be required by law. In the event that two or more Members have

H.     Amendment. This Agreement may be amended only by written consent of all the Members. Upon obtaining the approval of any such amendment, supplement or restatement as to the Certificate, the Company shall cause a Certificate of Amendment or Amended and Restated Certificate to be prepared, executed and filed in accordance with Alabama law.

I.     Entire Agreement. This Agreement contains the entire understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written, except as herein contained.

IN WITNESS WHEREOF, the Members have executed and agreed to this Limited Liability Company Operating Agreement, which shall be effective as of March 31, 2018.

Signature: _____
Davord Dai

Signature: _____
Ahmad Ali Negahban

Signature: _____
Matthew Syler

Signature: _____
Nicolas Negahban

## ATTACHMENT A
### *Initial Contributions of the Members*

The Initial Contributions of the Members of Bella Surfaces Group are as follows:

Huibin Dai
> Contribution:
> Cash: $1,600,000

Ahmad Ali Negahban
> Contribution:
> Cash: $1,600,000

Matthew Syler
> Cash: $400,000

Nicholas Negahban
> Cash: $400,000

Huibin Dai and Ahmad Ali Negahban agree to contribute as a loan to Matthew Syler and Nicolas Negahban of $400,000 for their 10% equity in Bella Surfaces Group at 0.00% interest with repayment in 24 months from June 1st 2018. If full payment has not been achieved the continuing shares will be representative of the amount remitted at a $4,000,000 evaluation.

Matthew Syler and Nicolas Negahban will have the right to purchase an additional 5% within the same 24 months for $300,000. Any purchase of equity after that date will be based on a fair evaluation provided by third party selected by the voting members.

EXHIBIT 2

## SETTLEMENT AGREEMENT AND GENERAL RELEASE

This separation agreement and general release is between Matthew Syler, an individual ("Syler"), Syler Group, LLC, an Alabama limited liability company ("Syler Group"), and Bella Surfaces Group, LLC, d/b/a Bella Flooring Group, an Alabama limited liability company ("Bella").

## BACKGROUND

Syler has been a Partner with Bella under the terms of a Compensation Agreement dated June 1, 2018 (the "Compensation Agreement"). Syler and Syler Group intend to sever all relationships with Bella, and the parties intend for this agreement: (1) to extinguish and supersede the Compensation Agreement; (2) to terminate and supersede any other acknowledged or alleged agreement between or among the parties, whether oral or written; and (3) to forever settle all claims and disputes between the parties.

The parties therefore agree as follows:

1.    **CONDITIONAL NATURE OF AGREEMENT.**  The payments and benefits being offered to Syler and Syler Group described below in Section 3 are expressly conditioned on and subject to acceptance of this agreement by Syler and the Syler Group. The covenants and releases offered below by Syler and Syler Group to Bella under this agreement are expressly conditioned on and subject to Bella's acceptance and full performance of this agreement, including payment.  The Separation Payment below, releases, and covenants offered below by Bella are expressly conditioned on and subject to full performance of this agreement by Syler and Syler Group.

2.    **SEPARATION FROM BELLA.**  Syler's last day with Bella was August 31, 2021 ("Separation Date").  As of the Separation Date, Syler has been removed from all of his positions with Bella and any parent, subsidiary, or affiliate of Bella.  Those positions may include, but are not necessarily limited to: registered agent, officer, employee, member, partner, owner, and contractor.

3.    **RELINQUISHMENT OF ALLEGED LLC INTEREST.**  As part of the termination and separation contemplated by this agreement, Syler and Syler Group agree to sign the Quitclaim Transfer and Redemption of Alleged Membership Interest in Bella Surfaces Group, LLC, which is attached as Exhibit 1 (the "Redemption").  By signing this agreement and the Redemption, Syler and Syler Group confirm that they are relinquishing any real or alleged membership interest in Bella and are transferring all real or alleged membership interest to Bella.  Syler and the Syler Group further agree to execute any other document necessary to effect this withdrawal with the Alabama Secretary of State or other governmental agency.  The parties expressly agree that nothing in this Section shall be deemed an admission (a) by Bella that either Syler or the Syler Group have ever been a member of Bella or have otherwise ever had any ownership interest in Bella or in any predecessor, parent, subsidiary, or other affiliate of Bella; (b) nor shall it be deemed an admission by Syler or the Syler Group that they did not have such a membership or ownership interest.

4.      **COVENANTS OF BELLA.**

4.1     <u>Separation Pay</u>.  Bella shall pay to Syler Group the total gross amount of $103,000 (the "Separation Pay").  The payment shall be made as follows:  (a)  Bella shall execute this agreement and deliver it to Kabat Chapman & Ozmer LLP ("KCO") with $53,000 in certified funds (the "initial payment") payable to Syler Group, after which Syler and Syler Group shall execute this agreement and all exhibits; (b) KCO will hold the initial payment in escrow pending execution of this agreement and exhibits by Syler and Syler Group and delivery of such signed agreement and exhibits to Chambliss Bahner & Stophel, P.C., and KCO will release the initial payment to Syler Group immediately upon such delivery.  Bella will pay Syler Group the remaining $50,000 in certified funds in two equal, separate installments of $25,000.  The first installment shall be paid no later than 30 days after Syler and Syler Group execute this agreement, and the second installment shall be paid no later than 30 days after payment of the first installment.

4.2     <u>No Other Compensation or Benefits</u>.  Except for the Separation Pay, Bella will not be obligated or liable to Syler or Syler Group for any compensation, salary, payment, bonus, commission, or benefit of any nature whatsoever.  Nor shall Bella be obligated or liable to Syler or Syler Group for any damages, penalty, interest, attorney fees, costs, or other amount of any kind whatsoever resulting from any alleged failure by Bella to pay Syler or Syler Group any compensation, salary, payment, bonus, commission, or benefit of any nature whatsoever.  Syler and Syler Group are accepting the Separation Pay in lieu of any and all other payments, benefits, or other amounts to which they might claim entitlement.  Syler and Syler Group expressly waive any claim or entitlement to any additional payments, benefits, or other amounts, whether of the type described above or otherwise.

4.3     <u>Form 1099</u>.  Bella will issue an IRS Form 1099 to Syler Group for the Separation Pay.  Syler Group and Syler will be responsible for paying any state or federal income tax or other tax obligation arising from such payment.

4.4     <u>Tax Indemnification</u>.  Syler Group and Syler are solely responsible for the payment of, and therefore promise to pay, all taxes, penalties, or other costs that may be assessed against them for the Separation Pay.  Bella shall have no duty to defend or indemnify Syler Group or Syler against any tax claim or assessment associated with the Separation Pay.  Syler Group and Syler shall cooperate in the defense of any tax claim brought against Bella associated with the Separation Pay and shall indemnify and hold harmless Bella in any action taken against Bella by any taxing authority challenging the allocation or characterization of the Separation Pay or seeking payment of any taxes, interest, penalties, or other assessments regarding the Separation Pay.  If there is any conflict between this section and any other section of this agreement, this section shall control.

5.      **SYLER AND SYLER GROUP RELEASE.**

5.1     Syler and the Syler Group release and forever discharge Bella and any successors, assigns, affiliates, members, managers, subsidiary company, related company,

and surviving company or companies by reason of any merger or acquisition of Bella, and all officers, trustees, shareholders, directors, members, managers, insurers, plan administrators, employees, agents, or attorneys of any of the foregoing entities (collectively referred to as "Bella Releasees") from all charges, complaints, claims, liabilities, obligations, actions, promises, agreements, causes of action, suits, demands, costs, losses, attorney fees, damages, debts, and expenses, whether known, unknown, disclosed, or undisclosed, that Syler or the Syler Group now have, own, or hold, claim to have, own, or hold, at any time heretofore had, owned, or held, or that they claimed to have, own, or hold, against the Bella Releasees.  This general release of all claims includes, but is not limited to, any claim under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.), the Equal Pay Act (29 U.S.C. § 206 et seq.), the Age Discrimination in Employment Act (29 U.S.C. § 621 et seq.), the Family and Medical Leave Act (29 U.S.C. § 2601 et seq.), the National Labor Relations Act (29 U.S.C. § 151 et seq.), the Worker Adjustment and Retraining Notification Act of 1988 (29 U.S.C. § 2101 et seq.), the Sarbanes-Oxley Act of 2002 (15 U.S.C. § 7201 et seq.), the Civil Rights Acts of 1866, 1871, 1964 and 1991, the Americans with Disabilities Act (42 U.S.C. § 12101 et seq.), the Rehabilitation Act of 1973 (29 U.S.C. § 701 et seq.), the Consolidated Omnibus Budget and Reconciliation Act of 1985 (29 U.S.C. § 1161 et seq.), the Employee Retirement Income and Security Act (29 U.S.C. § 1001 et seq.), the Older Workers Benefit Protection Act, the Genetic Information Nondiscrimination Act of 2008 (42 U.S.C. § 2000ff et seq.), all as amended.  This general release of all claims further releases Releasees from any claim under any other federal, state, or municipal statute, ordinance, regulation, or common law theory, or other law, including but not limited to any law protecting whistleblowers or proscribing retaliation, discrimination, harassment, or hostile work environment, regarding personal injury, regarding defamation, regarding wrongful discharge, or relating to rights and obligations under contract, whether express, implied, or otherwise.

     5.2    This is a **general release of all claims** except that Syler and the Syler Group are not waiving:  (a) any right or entitlement that cannot be waived as a matter of law; (b) any right or entitlement to any vested benefit in Bella's employee benefit or retirement plan; or (c) the right to file a charge or participate in an investigation with the Equal Employment Opportunity Commission or similar state administrative agency, although Syler expressly waives any right to recover a monetary award in connection with any and all such administrative claims, charges, lawsuits, or investigations related to Syler or Syler's employment with Bella.  Nothing in this agreement limits Syler's ability to file a charge or complaint with the Occupational Safety and Health Administration or the Securities and Exchange Commission, or any similar federal or state agency.  This agreement also does not limit Syler's ability to communicate with any such agency or otherwise participate in any investigation or proceeding that may be conducted by any such agency, including providing documents or other information, without notice to Bella.

    6.    **VALIDITY OF RELEASE LANGUAGE.**  This agreement is in full compliance with the Age Discrimination in Employment Act and Older Workers Benefit Protection Act (specifically 29 U.S.C. § 626(f)).  In particular:

     6.1    This agreement is written in a manner understandable to Syler.  Syler has read this agreement in its entirety, has had any questions about it fully answered to his

satisfaction, and fully understands its terms. Syler has been advised to consult with his attorney before executing this agreement.

6.2    The consideration provided to Syler under this agreement is in addition to anything of value to which he is already entitled.

6.3    Bella has offered and agreed to allow Syler a period of at least twenty-one (21) days within which to consider this agreement. Syler is under no obligation whatsoever to sign this agreement before the expiration of the twenty-one (21) day period, but may voluntarily choose to do so.

6.4    Syler may revoke this agreement within seven (7) days from the date on which he signs it ("Revocation Period"), and this agreement will not become effective or enforceable until after the Revocation Period has expired, and as provided in Section 21 of this agreement. To exercise his right to revoke this agreement, Syler must, within the Revocation Period, provide written notice that he is revoking this agreement to Tyler Geren, 3572 South Dug Gap Road, Dalton, Georgia, 30720; email: tgeren@bellaflooringgroup.com. Such written notice will be valid only if sent by U.S. registered or certified mail or email and received by Mr. Geren no later than the expiration of the Revocation Period. If not so revoked within the Revocation Period, this agreement will be valid, binding, and enforceable in all respects, except as provided in Section 21.

7.    **BELLA RELEASE.** Bella and the Bella Releasees release and forever discharge Syler and the Syler Group and any successors, assigns, affiliates, members, managers, subsidiary company, related company, and surviving company or companies by reason of any merger or acquisition of Syler Group, and all officers, trustees, shareholders, directors, members, managers, insurers, plan administrators, employees, agents, or attorneys of any of the foregoing entities (collectively referred to as "Syler Releasees") from all charges, complaints, claims, liabilities, obligations, actions, promises, agreements, causes of action, suits, demands, costs, losses, attorney fees, damages, debts, and expenses, whether known, unknown, disclosed, or undisclosed, that Bella now has, owns, or holds, claims to have, own, or hold, at any time heretofore had, owned, or held, or that it claimed to have, own, or hold, against the Syler Releasees. This is a **general release** of all claims.

8.    **CONFIDENTIALITY OF THIS AGREEMENT.** The terms of this agreement are STRICTLY CONFIDENTIAL. Syler and Syler Group shall not disclose, reveal, or disseminate, orally, electronically, in writing, or in any manner whatsoever, the fact or amount of the payments and benefits set forth in Section 4 or the contents of this agreement, except that Syler may discuss this agreement with his spouse, attorney, financial advisor, and tax preparer. If asked about any matter relating to this agreement, Syler shall not directly or indirectly say anything other than "the matter has been resolved" or words of similar effect.

9.    **BELLA PROPERTY.** Syler represents that he has returned to Bella all of Bella's physical property provided to Syler or Syler Group during the course of their work with Bella. Syler and Syler Group further represent that they have deleted or otherwise destroyed all electronically stored information provided to them by Bella during the course

of their work with Bella.  Syler and Syler Group agree that they: (a) shall immediately discontinue all use of Bella's physical property and electronically stored information, and (b) shall not attempt to log in to or otherwise access any network, software program, online account, or other electronic database owned or used by Bella.  Provided, however, that because Bella's Facebook page currently is tied to Syler's Facebook account, the Parties agree (a) to cooperate in transferring Bella's Facebook page to an account controlled by Bella, by reasonable commercial means; (b) if such transfer cannot be accomplished, the Parties will cooperate in saving the data from Bella's Facebook page and in deleting Bella's Facebook page from Syler's Facebook account, by reasonable commercial means, and (c) that maintaining, transferring, or deleting the Bella Facebook page in compliance with this sentence will not constitute a breach of  Section 9 or otherwise constitute a violation of this agreement.

10.    **NON-DISPARAGEMENT.**  Unless required to do so pursuant to legal process:

10.1    For purposes of this section, a disparaging statement or representation is any communication that, if publicized to another, would cause or tend to cause the recipient of the communication to question the business condition, integrity, competence, or quality of the person, product, or entity to which or whom the communication relates.

10.2    Syler shall not, for a period of six months following execution of this agreement, make or cause to be made any disparaging statements or representations, either directly or indirectly, whether orally or in writing, electronically, by word, or gesture, to any person whatsoever about Bella or its representatives, directors, subsidiary companies, affiliate companies, officers, employees, contractors, consultants, agents, or attorneys, or about any product designed, manufactured, or sold by Bella or any subsidiary of Bella.

10.3    Bella shall not, for a period of six months following execution of this agreement, make or cause to be made any disparaging statements or representations, either directly or indirectly, whether orally or in writing, electronically, by word, or gesture, to any person whatsoever about Syler or Syler Group or Syler Group's representatives, directors, subsidiary companies, affiliate companies, officers, employees, contractors, consultants, agents, or attorneys, or about any product designed, manufactured, or sold by Syler or Syler Group or any subsidiary or affiliate of Syler Group.

11.    **RESTRICTIONS ON SOLICITATION.**

11.1    **Nonsolicitation of Employees.** Through February 28, 2022, Syler shall not directly or indirectly solicit any person who is or was an employee or independent contractor of Bella during the six-month period immediately preceding the Separation Date to become an employee or independent contractor for any person or entity other than Bella.

11.2    **Nonsolicitation of Customers.**  Through February 28, 2022, Syler shall not directly or indirectly solicit, for the sale of any product sold by Bella prior to the Separation Date, any person or entity who was a customer of Bella during the six-month period immediately preceding the Separation Date.

12.    **REPRESENTATION OF NO CLAIMS; COVENANT NOT TO SUE.**

    12.1    Syler and Syler Group represent that neither of them has filed any notice, claim, complaint, charge, or lawsuit of any kind whatsoever against Bella or against any of the other Bella Releasees with any court, governmental agency, regulatory body, arbitration organization, or other third party.  Bella represents that it has not filed any notice, claim, complaint, charge, or lawsuit of any kind whatsoever against Syler or Syler Group or against any of the other Syler Releasees with any court, governmental agency, regulatory body, arbitration organization, or other third party.

    12.2    Syler and Syler Group, jointly and severally, covenant and agree that neither they nor any person or firm acting on their behalf will hereafter sue, assert, or otherwise pursue any claim against Bella or any of the other Bella Releasees that relates to the subject matter of this agreement.  Bella covenants and agrees that neither it nor any person or firm acting on its behalf will hereafter sue, assert, or otherwise pursue any claim against Syler or Syler Group or any of the other Syler Releasees that relates to the subject matter of this agreement.

    12.3    Syler and Syler Group, jointly and severally, agree to indemnify and hold Bella and the other Bella Releasees harmless from and against all liability for all such claims and further jointly and severally agree to pay all costs and expenses (including attorney fees and litigation costs) that Bella or the other Bella Releasees may incur as a result of any breach or violation of this provision.  Bella agrees to indemnify and hold Syler and Syler Group and the other Syler Releasees harmless from and against all liability for all such claims and to pay all costs and expenses (including attorney fees and litigation costs) that Syler or Syler Group or the other Syler Releasees may incur as a result of any breach or violation of this provision.

    12.4    The parties represent and warrant that they have not assigned, transferred, or purported to assign or transfer to any other person or entity any rights, claims, or causes of action herein released and discharged and no other person or entity has any interest in the matters herein released and discharged.

    12.5    If any court, administrative agency, or any other tribunal has or assumes jurisdiction of any claim, charge, complaint, cause of action, lawsuit, action, or other proceeding against any of the parties or their releasees that relates to the subject matter of this agreement, then the other party agrees that it shall seek to withdraw from such proceeding and shall request that such court, administrative agency, or tribunal dismiss the matter with prejudice or otherwise permanently dispose of such matter.

    13.    **NO ADMISSION.**  This agreement is a compromise of disputed claims and should therefore not to be construed as an admission of wrongdoing by any party.

    14.    **ATTORNEY FEES AND LITIGATION EXPENSES.**  The prevailing party in any action to enforce this agreement shall be entitled to recover from the other party all expenses of litigation, including but not limited to attorney fees and court costs.

DocuSign Envelope ID: 97BF9543-6281-4080-B860-3AFBA880D58C

15.     **ENTIRE AGREEMENT.**  This agreement sets forth the entire agreement between the parties, and it fully supersedes any prior agreements or understandings between them pertaining to the subject matter of this agreement.  The parties specifically agree that this agreement supersedes and extinguishes the Compensation Agreement.  The parties agree that they may modify this agreement only by a subsequent, written agreement that is executed by both parties.

16.     **VOLUNTARY AGREEMENT.**  The parties voluntarily execute this agreement, and the execution of this agreement is not based upon any representation by the other party as to the merits, legal liability, or value of any claims or any other matter related to this agreement.

17.     **GOVERNING LAW; VENUE.**  This agreement shall be governed by and construed in accordance with Georgia law, without reference to any conflicts of laws principles.  Any legal action, claim, or proceeding relating to this agreement or the relationship between the parties must be filed in a state or federal court of competent jurisdiction in or covering Whitfield County, Georgia.  The parties specifically and irrevocably submit and consent to the jurisdiction of any state or federal court in or covering Whitfield County, Georgia.

18.     **EFFECTIVE DATE.**  Unless Syler exercises his right to revoke this agreement in accordance with Section 6.4, this agreement will become effective on the date that the last party signs it or on the eighth (8th) day after Syler signs it, whichever is later ("Effective Date").

19.     **SEVERABILITY.**  If any provision of this agreement is held to be unenforceable, then that provision is to be construed either by modifying it to the minimum extent necessary to make it enforceable (if permitted by law) or by disregarding it (if not permitted by law).  If an unenforceable provision is modified or disregarded in accordance with this section, the rest of the agreement is to remain in effect as written, and the unenforceable provision is to remain as written in any circumstances other than those in which the provision is held to be unenforceable.

**BY SIGNING BELOW, SYLER, SYLER GROUP, AND BELLA ACKNOWLEDGE THEY HAVE READ THIS AGREEMENT IN ITS ENTIRETY AND FULLY UNDERSTAND AND AGREE TO ALL OF ITS TERMS.**

11/22/2021
_____
Date Signed

MATTHEW SYLER

SYLER GROUP, LLC

11/22/2021
_____
Date Signed

By: _____

Name: Matthew Syler

Title: Owner
_____

BELLA SURFACES GROUP, LLC

11/17/2021
_____
Date Signed

By: Tyler Geren
_____

Name: Tyler Geren

Title: CEO
_____

EXHIBIT 3

## QUITCLAIM TRANSFER AND REDEMPTION
## OF ALLEGED MEMBERSHIP INTEREST IN
## BELLA SURFACES GROUP, LLC

THIS QUITCLAIM TRANSFER AND REDEMPTION OF ALLEGED MEMBERSHIP INTEREST (the "**Redemption**") is made between MATTHEW SYLER and SYLER GROUP, LLC (collectively, "**Transferors**") and BELLA SURFACES GROUP, LLC, an Alabama limited liability company (the "**the Company**").

1. <u>Purpose</u>.  This Redemption is part of the consideration agreed to by the parties as part of their larger Settlement Agreement and General Release that is being executed contemporaneously with this Redemption. Transferors desire to transfer, release, convey, and forever quitclaim to the Company, its successors and assigns, all of Transferors' right, title, and interest in the Company, if any (the "**Membership Interest**"), and the Company desires to accept and redeem the Membership Interest.

2. <u>Transfer and Redemption</u>.  Transferors transfer, release, convey, and forever quitclaim to the Company any Membership Interest that Transferors may have in the Company, and the Company accepts and redeems the Membership Interest. Transferors acknowledge and agree that, following this Redemption:  (a) the Company and its successors and assigns, shall hold the Membership Interest free and discharged from all rights, title, claims, or interest of Transferors; and (b) Transferors have no remaining right, title, or interest of any kind in the Company or any of the Company's parents, subsidiaries, successors, or other affiliates.

3. <u>Further Assurances</u>.  Transferors and the Company covenant and agree that each shall take any further actions as may be reasonably necessary to implement the transactions contemplated by this Redemption.

4. <u>No Admission</u>.  This Redemption is meant to be a compromise and resolution of the parties' dispute.  The parties expressly acknowledge and agree that nothing in this Redemption shall be construed as an admission by the Company that Transferors have ever owned any percentage or other interest in the Company.

5. <u>Effective Date</u>.  This Redemption shall become effective on the date the last party signs it.

(Signature Page Follows)

# QUITCLAIM TRANSFER AND REDEMPTION
# OF ALLEGED MEMBERSHIP INTEREST IN
# BELLA SURFACES GROUP, LLC

IN WITNESS WHEREOF Transferors and the Company have entered into this Redemption as of the Effective Date.

**TRANSFERORS:**

11/22/2021

_____
Date Signed

MATTHEW SYLER

SYLER GROUP, LLC

11/22/2021

_____
Date Signed

By: _____

Name: Matthew Syler

Title: Owner

**TRANSFEREE:**

BELLA SURFACES GROUP, LLC

11/17/2021

_____
Date Signed

By: Tyler Geren

Name: Tyler Geren

Title: CEO